IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PEDRO JOSE BACA,

    Plaintiff,

vs.                                                        No. 22-CV-27-KRS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

    Defendant.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court upon Plaintiff's Motion to Reverse and Remand, with Supporting Memorandum (Doc. 21), dated August 10, 2022, challenging the determination of the Commissioner of the Social Security Administration ("SSA") that Plaintiff is not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Commissioner responded to Plaintiff's motion on October 6, 2022 (Doc. 23), and Plaintiff filed a Notice of Briefing Complete (Doc. 24). With the consent of the parties to conduct dispositive proceedings in this matter, *see* 28 U.S.C. § 636(c); FED. R. CIV. P. 73(b), the Court has considered the parties' filings and has thoroughly reviewed the administrative record. Having done so, the Court concludes that the ALJ did not err in his decision and will DENY Plaintiff's Motion.

**I. PROCEDURAL POSTURE**

On April 9, 2019, Plaintiff filed an initial application for disability insurance benefits. (*See* Administrative Record ("AR") at 155-56). Plaintiff alleged that he had become disabled on December 1, 2012, due to a fractured vertebra, carpal tunnel, bulging disks, and a damaged spinal cord. (*Id.* at 79-80, 155). Plaintiff's date last insured, the date through which he could be

eligible to receive disability insurance benefits, was December 31, 2017.[1] (*Id*. at 79). Plaintiff's application was denied at the initial level on July 16, 2019 (*id.* at 78-85), and at the reconsideration level on October 22, 2019 (*id.* at 86-97). Plaintiff requested a hearing (*id.* at 109-10), which ALJ Michael Leppala conducted telephonically on September 14, 2020 (*id.* at 44-77). Plaintiff was represented by counsel and testified at the hearing, as did vocational expert Mary Weber (the "VE"). (*Id.*).

On October 8, 2020, the ALJ issued his decision, finding that Plaintiff was not disabled under the relevant sections of the Social Security Act. (*Id.* at 29-37). Plaintiff requested that the Appeals Council review the ALJ's decision (*id.* at 152-53), and on March 2, 2021, the Appeals Council denied the request for review (*id.* at 15-20), which made the ALJ's decision the final decision of the Commissioner. *See Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003). On January 13, 2022, Plaintiff filed the Complaint in this case seeking review of the Commissioner's decision. (Doc. 1).

## II. LEGAL STANDARDS

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016) (citing *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)); *see also* 42 U.S.C. § 405(g). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116,

---

[1] In order to quality for disability insurance benefits, a claimant must establish that he met the statutory requirements for disability on or before his date last insured. *See Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010).

1118 (10th Cir. 2004). Although a court must meticulously review the entire record, it "may neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]." *See, e.g., id.* (quotation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is "not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154 (quotation omitted); "if it is overwhelmed by other evidence in the record[,]" *Langley*, 373 F.3d at 1118 (quotation omitted); or if it "constitutes mere conclusion[,]" *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the record as a whole, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262 (citation omitted). While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996) (citation omitted), and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Id.* at 1010 (quotation omitted). "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation and citation omitted).

### B.  Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. § 404.1520. If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite her limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that" the claimant retains sufficient RFC "to perform work in the national economy, given his age, education and work experience." *Grogan*, 399 F.3d at 1261 (citation omitted); *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### III.  THE ALJ'S DETERMINATION

The ALJ reviewed Plaintiff's claim pursuant to the five-step sequential evaluation process. (AR at 29-37). First, ALJ Leppala found that Plaintiff met the SSA's insured status requirements through the relevant period and had not engaged in substantial gainful activity from his alleged onset date of December 1, 2012, through his date last insured of December 31, 2017. (*Id.* at 31). The ALJ then found at step two that Plaintiff suffered from the nonsevere impairments of carpal tunnel syndrome and obesity as well as the following severe impairments:

"stenosis of the cervical spine, lumbosacral spondylosis, degeneration of lumbar intervertebral disc, and obstructive sleep apnea." (*Id.*). At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met the criteria of listed impairments under Appendix 1 of the SSA's regulations. (*Id.* at 32).

Moving to the next step, the ALJ reviewed the evidence of record, including medical opinions and evidence from treating and consulting providers, prior administrative medical findings, and Plaintiff's own subjective symptom evidence. (*See id.* at 32-35). Having done so, the ALJ concluded that for the relevant period, Plaintiff possessed an RFC to "perform light work as defined in 20 [C.F.R. §] 404.1567(b) except [Plaintiff] is limited to occasionally climbing ladders, ramps, and stairs; occasionally climbing ropes and scaffolds; and occasional balancing, stooping, kneeling, crouching, and crawling." (*Id.* at 32). Based on this RFC, the ALJ found that Plaintiff was unable to perform any past relevant work during the relevant period. (*Id.* at 35).

Moving to step five, the ALJ determined that Plaintiff could have performed other jobs existing in significant numbers in the national economy. (*Id.* at 35). The ALJ therefore concluded that Plaintiff's work was not precluded by his RFC and that he was not disabled at any time from December 1, 2012, through December 31, 2017. (*Id.* at 36).

## IV.  DISCUSSION

Plaintiff contends that the ALJ failed to properly consider his subjective complaints pursuant to SSR 16-3p (*see* Doc. 21 at 6-12), to adequately develop the record (*see id.* at 12-13), or to properly consider the combination of impairments in Plaintiff's RFC (*see id.* at 13-15). The Court disagrees with Plaintiff as to each claim.

### A. Plaintiff's Subjective Complaints

First, Plaintiff contends that the ALJ failed to properly evaluate his subjective allegations in accordance with Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304 (Oct. 25, 2017). (Doc. 23 at 6-12). SSR 16-3p defines the two-step process an ALJ must use when evaluating a claimant's symptoms. *See* SSR 16-3p, 2017 WL 5180304. At the first step, the ALJ "consider[s] whether there is an underlying medically determinable physical or mental impairment[] that could reasonably be expected to produce [the] individual's symptoms such as pain." *Id*. at *3. At the second step, after the ALJ has found such an impairment, the ALJ "evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit [the] individual's ability to perform work-related activities . . . ." *Id*. The ALJ considers the record evidence, the claimant's statements, the medical and non-medical source statements, and a non-exhaustive list of factors provided in 20 C.F.R. § 404.1529(c)(3), which include:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8.

Here, the ALJ determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." (AR at 33). In so concluding, the ALJ purported to

6

consider "the nature of [Plaintiff's] symptoms; precipitating and aggravating factors; the medications and any side effects; and other treatment followed and measures used to relieve symptoms." (*Id.* at 34 (citing 20 C.F.R. § 404.1529; SSR 16-3p)). Plaintiff, however, insists that ALJ Leppala failed to sufficiently consider the SSR 16-3p factors with respect to his subjective complaints of pain, weakness, and difficulty sleeping. (Doc. 21 at 10). Specifically, he contends that the ALJ neglected to consider the location, duration, frequency, and intensity of his pain and other symptoms, the factors that precipitate and aggravate his symptoms, treatment other than medication, and other measures for relief. (*Id*. at 10-11).

Relevant to SSR 16-3p, ALJ Leppala explicitly discussed:

***Daily activities:*** ALJ Leppala indicated that Plaintiff "reported performing some largely independent daily activities, including going for walks, driving a motor vehicle, and providing care for pets." (AR at 34 (citing AR at 42-77, 227-34)). At the same time, the ALJ also acknowledged Plaintiff's testimony that his pain kept him from engaging in prolonged activity. (*Id*. at 33).

***The location, duration, frequency, and intensity of pain or other symptoms:*** ALJ Leppala reviewed Plaintiff's complaints of pain in his neck, shoulders, arms, and lower back. (*Id*.). He noted Plaintiff's testimony that his cervical spine pain radiates into his bilateral shoulders and upper extremities. (*Id*.). Relatedly, the ALJ acknowledged Plaintiff's "allegations of constant radiating spine pain, upper extremity numbness, and upper extremity weakness." (*Id*. at 34). The ALJ recounted Plaintiff's testimony that his pain was *constant* and caused difficulty lifting, carrying, ambulating, standing, and walking for prolonged periods. (*Id*. at 33).

7

As to Plaintiff's sleep apnea, the ALJ noted Plaintiff's reports of snoring as well as difficulty falling and staying asleep. (*Id*. (citing AR at 42-77, 556)). He also summarized Plaintiff's hearing testimony in which he alleged poor sleep despite using a CPAP machine. (*Id*.).

***Factors that precipitate and aggravate symptoms*:** The ALJ explained that Plaintiff's "stenosis of the cervical spine, lumbosacral spondylosis, [and] degeneration of lumbar intervertebral disc" caused chronic radiating neck and back pain, decreased range of motion in his spine, weakness in his upper extremities, and hyperreflexic reflexes. (*Id*. (citing AR at 42-77, 284-85, 320, 553-54)). The ALJ also noted that Plaintiff's sleep apnea was likely caused by his "very" enlarged tonsils. (*Id*. at 34 (citing AR at 554)).

***Type, dosage, effectiveness, and side effects of any medication:*** According to the ALJ, Plaintiff's medication regimen for pain relief included Meloxicam and Hydrocodone. (*Id*. at 33 (citing AR at 42-77, 284, 553)). The ALJ also mentioned that Plaintiff reported to medical examiners that Tylenol was effective at reducing his pain following his neck surgery. (*Id*. at 34 (citing AR at 315)). Finally, the ALJ observed that during his hearing testimony, Plaintiff "did not identify any side effects associated with his medications." (*Id*. (citing AR at 42-77)).

***Treatment other than medication:*** The ALJ mentioned that in December 2012, Plaintiff "underwent an anterior cervical discectomy, bone graft, and plating procedure[,]" which improved his symptoms but left him with mild hand stiffness. (*Id*. at 33 (citing AR at 314-15, 325-27)). Likewise, he discussed Plaintiff's December 2013 left wrist carpal tunnel release procedure, which also provided improvement to his symptoms. (*Id*. at 31-32 (citing AR at 294-95, 294, 505)). With respect to Plaintiff's sleep apnea, the ALJ found an absence of treatment. (*Id*. at 34). That is, he observed that during the relevant period Plaintiff had not received a CPAP

machine or any other sleep apnea treatment. (*Id*.). The ALJ also indicated that "no sleep study had been conducted during the period relevant to this case." (*Id*. (citing AR at 319)).

Although Plaintiff cannot dispute that the ALJ discussed the factors above, he takes issue with the ALJ's characterization of the evidence pertaining to these factors. First, referring the Court to portions of his own 2019 Function Report, Plaintiff insists that his daily activities were "more limited than the ALJ alluded to in his decision." (Doc. 21 at 9-10 (citing AR at 227-28, 230, 234)). As noted above, the ALJ, relying upon the same Function Report, found that Plaintiff engaged in "largely independent daily activities." (AR at 34 (citing AR at 227-34)). Again, the ALJ specified that Plaintiff went on walks, drove a motor vehicle, and provided care for pets. (*Id*. (citing AR at 227-34)). Although Plaintiff concedes that he reported being able to drive and go out alone, he emphasizes that his family helped him care for pets. (Doc. 21 at 9 (citing AR at 228)). The Function Report, though, suggests that Plaintiff, too, contributed to the pets' care by feeding, watering, and cleaning up after them. (*See* AR at 228). Plaintiff's Function Report also reveals that he attended his grandchildren's sports practices and games and went hunting once a year. (*Id*. at 231). In addition, Plaintiff indicated that he sometimes, though "seldom," coached, rode horses, and threw a football or baseball with his grandchildren. (*Id*.). Additionally, Plaintiff reported being able to perform light housework and yard work and go shopping. (*Id*. at 229-30). Without reweighing the evidence, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff engaged in "largely independent daily activities."

Next, Plaintiff takes issue with the ALJ's finding that he had not undergone a sleep study or been diagnosed with sleep apnea. (Doc. 21 at 9). Pointing to records from office visits with Nurse Practitioner Suzanne L. Dennehy in December 2017 and March 2018, Plaintiff submits that the ALJ's finding is inaccurate. *Id*. Nurse Dennehy's December 29, 2017 record indicates

that Plaintiff was scheduled for a sleep study the following week. (AR at 552). Her March 29, 2018 record does not explicitly state whether the mentioned sleep study took place, but Nurse Dennehy includes a diagnosis and assessment of "[o]bstructive sleep apnea" and reports that Plaintiff "does not have C-pap machine at this time." (*Id*. at 547-51). Significantly, though, the relevant period for purposes of Plaintiff's DIB claim is from December 1, 2012, to December 31, 2017. (*Id*. at 79-80). As such, the March 29, 2018 record to which Plaintiff refers does not undermine the ALJ's determination that Plaintiff had not undergone a sleep study or received a diagnosis of sleep apnea during the relevant period. (*See id*. at 318 (Nov. 23, 2012 record indicating that Plaintiff had not received a "formal diagnosis of sleep apnea" and had undergone "no formal sleep study"). Moreover, although substantial evidence supports the ALJ's finding that Plaintiff was not diagnosed with or treated for sleep apnea during the relevant time period, the ALJ nevertheless found Plaintiff's sleep apnea to be a severe impairment. (*Id*. at 31). Accordingly, he took Plaintiff's sleep apnea into account in assessing his RFC. (*See id*. at 32-35). After discussing the records and Plaintiff's testimony as they relate to this condition, the ALJ explained that due to a combination of Plaintiff's sleep apnea and his back and neck conditions, he "should be limited to light exertional work, where he would only occasionally climb." (*Id*. at 35). The Court finds no error in this regard.

With respect to his medications, Plaintiff emphasizes that Nurse Dennehy "continued to prescribe muscle relaxers and narcotic pain medication in addition to Tylenol 8 Hour." (Doc. 21 at 9 (citing AR at 552-54, 558-59, 564-66)). Yet, during his hearing testimony, Plaintiff indicated that "[t]he only thing [he] take[s] is Ibuprofen and pain medication." (AR at 58). The ALJ observed that Plaintiff "reported to examiners that Tylenol was affective [sic] at reducing pain." (*Id*. at 34 (citing AR at 315)). In support, he referenced a May 2, 2014 Progress Note wherein

10

Naresh P. Patel, M.D. reported that after his neck surgery Plaintiff was taking "Tylenol once every 2 to 3 days and always less than 1000 mg." (*Id*. at 315)). But, significantly, the ALJ did not suggest that Plaintiff took Tylenol alone. Indeed, elsewhere in his decision, he discussed Plaintiff's "prescription regimen[, which] included Meloxicam[2] and Hydrocodone.[3]" (*Id*. at 33 (citing AR at 42-77, 284, 553)). The ALJ cited two records in this regard: an April 26, 2015 post-cervical-surgery record in which Stephen F. Noll, M.D. explained that Plaintiff "ha[d] taken muscle relaxants, ibuprofen and occasional hydrocodone without significant relief of pain" (*id*. at 284); and a December 29, 2017 progress note in which Nurse Dennehy listed Meloxicam and Hydrocodone among Plaintiff's "Current Outpatient Prescriptions" (*id*. at 553). The record supports the ALJ's findings.

     Plaintiff also contends that he "was not asked about any side effects from medication during the hearing." (Doc. 21 at 10). To the contrary, though, the ALJ *did* ask Plaintiff whether there were "any bad things or any side effects" from his medication, and Plaintiff responded, "No. No. They don't." (AR at 59). Plaintiff went on, explaining, "the Ibuprofen is the one I take for pain." (*Id*.). Plaintiff's own attorney also questioned him about side effects from his medications. (*Id*. at 63). In response, Plaintiff explained that at one time he took medication for nerve pain that made him "agitated" and "mad," intensified his pain, and caused seizures. (*Id*.). According to Plaintiff, he discontinued use of that medication. (*Id*. at 63-64). In sum, the record suggests that the ALJ inquired about side effects from Plaintiffs' medication regimen, but

---

[2] Meloxicam is typically used to treat arthritis, as it "reduces pain, swelling, and stiffness of the joints." *Meloxicam – Uses, Side Effects, and More*, WebMD, https://www.webmd.com/drugs/2/drug-911/meloxicam-oral/details (last visited Jan. 5, 2023).

[3] Hydrocodone is an "opiate (narcotic) analgesic" and "is used to relieve severe pain." *Hydrocodone*, MedlinePlus, https:/medlineplus.gov/druginfo/meds/a614045.html#why (last visited Jan. 5, 2023).

11

Plaintiff indicated that the medications he was taking did not cause adverse side effects. The Court finds no harmful error with respect to the ALJ's consideration of Plaintiff's medications.

As to treatment other than medication, Plaintiff correctly observes that the ALJ failed to mention that he received injections for muscle spasms and pain. (Doc. 21 at 9 (citing AR at 552-54, 558-59, 564-66)). At the hearing, Plaintiff testified that he had previously "tried all kinds [of] pain management, some injections." (AR at 59). But, as noted above, Plaintiff indicated that he relied primarily upon Ibuprofen for pain rather than other methods of pain management. (*Id*.). Again, the Court finds no harmful error in this regard.

Next, Plaintiff complains that "the ALJ failed to consider all the objective findings by Nurse Dennehy" despite such findings being consistent with his complaints. (Doc. 21 at 9-12). But the Court's review of the ALJ's decision reveals that he referenced and discussed the relevant portions of Nurse Dennehy's records. (*See, e.g*, *id*. at 33 (citing AR at 553-56, 558)). The ALJ observed that Nurse Dennehy's records indicated no extremity edema and no neurological deficits. (*Id*. (citing AR at 558)). At the same time, though, he mentioned Nurse Dennehy's findings that Plaintiff suffered from decreased range of motion, tenderness, and pain in his back. (*Id*. (citing AR at 554)). And, more broadly, he noted Plaintiff's complaints to Nurse Dennehy that he was experiencing chronic neck and back pain. (*Id*. (citing AR at 556)).

As the Commissioner points out, the ALJ discussed the mixed objective findings in the record, which at times reported a decreased range of motion due to neck and back pain but at other times revealed full range of motion, no neurological defects, grossly intact sensation, and normal gait. *See* AR at 32-34 (citing AR at 285 (Apr. 4, 2016 record from Dr. Noll indicating that joint range of motion and manual muscle testing were "grossly normal" in both upper extremities), 314 (Nov. 1, 2013 record from Dr. Patel observing a "normal-spaced gait with

minimal spasticity" and reporting "improvement of symptoms" following cervical diskectomy), 320 (Nov. 23, 2012 record from John H. Demenkoff, M.D. indicating Plaintiff has muscular spasms bilaterally and weakness in the upper extremities but was otherwise neurologically "symmetrical"), 554 (Dec. 29, 2017 record from Nurse Dennehy noting decreased range of motion, tenderness, and lower back pain), 558 (Nov. 22, 2017 record from Nurse Dennehy observing normal range of motion in neck but decreased range of motion, tenderness, pain, and spasm in cervical back and lumbar back). The evidence reporting full range of motion, no neurological defects, grossly intact sensation, and normal gait (*see* AR 32-34 (citing AR at 320, 554, 285, 558, 314)) constitutes substantial evidence supporting the ALJ's determination that "the evidence of record does not fully support [Plaintiff's] allegations about the severity of [his] symptoms." (*See* AR at 34). As best the Court can surmise, Plaintiff essentially asks the Court to reweigh the records from Nurse Dennehy; something the Court cannot do.

Taken as a whole, the ALJ's decision provides reasons, supported by substantial evidence, for not fully accepting Plaintiff's reported symptoms. The Court is satisfied that the ALJ adequately explained his findings regarding Plaintiff's subjective complaints pursuant to SSR 16-3p, and Plaintiff has not identified any meritorious reason for remand on this ground.

### B. Development of the Record

Next, Plaintiff maintains that the ALJ failed to properly develop the record. (Doc. 21 at 12-13). In so arguing, he highlights various categories of purportedly missing records. (*Id*.). First, he references a missing post-date-last-insured ear, nose and throat report from March 2018, which he indicates outlines the results of a sleep study. (*Id*. (citing AR at 273)). Second, he observes that, although Nurse Dennehy referred him to physical therapy in 2015 for his shoulder symptoms, there are no physical therapy records available. (*Id*. at 13). Similarly, he notes that

there are no chiropractic or massage care records, despite references to such treatment. (*Id*.). Finally, he suggests that there are inadequate records related to his purported hearing loss, as another post-date-last-insured record from March 2018 indicates normal to severe hearing loss in his left ear. (*Id*. (citing AR at 275)).

Contrary to Plaintiff's present position, though, his attorney at the administrative hearing gave no indication that further develop of the record was necessary. In fact, when the ALJ asked Plaintiff's attorney directly whether the record was complete, he responded, "I believe it is, Your Honor." (*Id*. at 46). The ALJ followed up, explaining, "If you're not sure, I can keep the record open for an additional 30 days." (*Id*.). Plaintiff's attorney responded, "It's complete, Your Honor. It's complete. We've gotten everything we could get our hands one, everything we needed, and I think it's complete." (*Id*.). The ALJ confirmed, indicating, "So it is complete . . . . I am going to close the record at this time then." (*Id*.). The Court will not ordinarily remand for failure to develop when a claimant's attorney affirmatively indicates that the record is complete and does not suggest that any medical records are missing from the record. *See, e.g.*, *Maes v. Astrue*, 522 F.3d 1093, 1097 (10th Cir. 2008).

Even putting aside his attorney's assurances that the record was complete, Plaintiff's failure-to-develop claim remains without merit. The Commissioner describes Plaintiff's argument as "cursory" (Doc. 23 at 12), and the Court agrees. Critically, Plaintiff makes no effort to demonstrate how the missing records would have supported additional functional limitations. In fact, he fails to offer any detail as to what would be found in the missing physical therapy, chiropractic, massage care, audiology, or sleep study records. With respect to Plaintiff's sleep study, the Court has already explained that it was not conducted within the relevant period and, moreover, that the ALJ found sleep apnea to be a severe impairment for which he assessed

limitations. Plaintiff has not alleged any harmful error with respect to the ALJ's development of the record. The Court will not reverse on this ground.

### C. Consideration of Effects of Carpal Tunnel Syndrome

In his final argument, Plaintiff contends that the ALJ erred by failing to consider the combination of impairments in the RFC. (Doc. 21 at 13-15). More specifically, he maintains that the ALJ failed to properly consider the effects of his carpal tunnel syndrome when formulating his RFC. (*Id*. at 16). But, again, Plaintiff fails to demonstrate that his carpal tunnel impairment warranted additional functional limitations during the relevant period.

The ALJ characterized Plaintiff's carpal tunnel syndrome as a non-severe impairment, finding that it "has either been successfully treated, controlled, stabilized, or otherwise does not more than minimally affect [Plaintiff's] ability to perform basic work activities." (AR at 31). The ALJ noted that Plaintiff "underwent a left wrist carpal tunnel release procedure in December 2013," which improved his symptoms. (*Id*. at 31-32 (citing AR at 294-95, 494, 505)). Plaintiff argues that "[t]he ALJ's citations were to improvement in symptoms, which are not supported by the record." (Doc. 21 at 14). The Court disagrees.

Two of the records to which the ALJ referred were from 2019, after Plaintiff's date last insured. (*See* AR at 494, 505). These records noted that Plaintiff's symptoms had improved following his 2013 left carpal tunnel release. (*See* AR at 494, 505). They also reported a *recent* escalation of pain and sensory symptoms in Plaintiff's upper extremities. (*See* AR at 494, 505). In short, the records suggest that Plaintiff's carpal tunnel symptoms had improved until sometime around 2019. Although Plaintiff points to language in the April 22, 2019 record, which indicates that he "still had problems with an escalation of symptoms in 2015 . . . that persisted despite chiropractic and massage," the context of the record indicates that the symptoms to

15

which the provider was referring related to Plaintiff's neck impairment rather than to his carpal tunnel impairment. (*See* AR at 494). The Court is satisfied that there is substantial evidence to support the ALJ's finding that Plaintiff's 2013 carpal tunnel release improved his symptoms during the relevant period. Moreover, the ALJ considered, indeed cited, the records upon which Plaintiff relies in his briefing. To the extent that Plaintiff invites the Court to reweigh such evidence, the Court declines Plaintiff's invitation.

Ultimately, the ALJ found no evidence that Plaintiff's carpal tunnel syndrome "cause[d] more than minimal limitations [in Plaintiff's] ability to perform work-related activities" during the relevant period. (*Id*. at 31 (citing 20 C.F.R. § 404.1522, SSR 85-28)). Even so, the ALJ explicitly stated that any limitations caused by Plaintiff's carpal tunnel syndrome were incorporated into the RFC. (*Id*. at 32). Indeed, the applicable regulations required as much. *See* 20 C.F.R. 404.1545(a)(1) ("We will consider all of your medically determination impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."). When, as here, an ALJ indicates that he has considered the effects of the impairments in combination, the court typically takes them at their word. *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007).

But, here, the ALJ went further. He also specified in his RFC assessment that he limited Plaintiff "to light work with additional postural limitations" in part to account for his "weakness in the upper extremities." (AR at 34 (citing AR at 285, 320, 554)). Thus, the record suggests that the ALJ took the reported symptoms of Plaintiff's carpal tunnel syndrome into account in assessing his RFC. Plaintiff fails to identify any additional function limitations that were warranted by the record. Nor does he demonstrate that the ALJ failed to properly consider the

records related to the effects of his carpal tunnel syndrome during the relevant period. The Court will deny Plaintiff's motion on this final ground.

## V. Conclusion

Having conducted a thorough review of the administrative record, the Court concludes that the ALJ applied the correct legal standards and that his factual findings were supported by substantial evidence. Plaintiff's arguments to the contrary are not well-taken. Accordingly, Plaintiff's Motion to Reverse and Remand, with Supporting Memorandum (Doc. 21) is **DENIED.**

*[signature]*

**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**